UNITED STATES DISTRICT COURT
NORTHEN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: SOURCECORP, INC.          §
                                 §          3:04-CV-02351-N
SECURITIES LITIGATION            §              ECF
                                 §

PLAINTIFFS' OPPOSITION TO DEFENDANT
BILL D. DEATON'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION.........................................................................................................1

FACTUAL BACKGROUND ........................................................................................1

    Deaton & Image Entry Perpetrate An Accounting Fraud. .......................................2

    SourceCorp Reveals Deaton & Image Entry's Fraud. ............................................3

    The Bad News Continues.........................................................................................4

    SourceCorp Restates Earnings And Discusses The Fiasco With Deaton &
    Image Entry.............................................................................................................4

    SourceCorp Deals With Deaton & Image Entry.....................................................5

I.      **DEATON AND IMAGE ENTRY FACE LIABILITY AS PRIMARY
       VIOLATORS UNDER THE EXCHANGE ACT AND RULE 10b-5.**..............7

      A.    *Central Bank* Does Not Shield Fraudsters Who Provide False
           Information Or Data To Other Actors Intending and Expecting That
           Those Other Actors Will Disseminate That False Information To The
           Market. .........................................................................................................8

           1.    Like the defendants in *Kidder*, Deaton and Image Entry
                 face primary liability under the Exchange Act because they
                 reported inflated financial results to the corporate parent. ..............9

           2.    Texas Federal Courts Follow The Rationale That Drove
                 *Kidder.* ..............................................................................................10

           3.    Texas Federal Courts Accept The SEC's Argument Rejecting
                 Deaton's Proposed Application Of *Central Bank.*...........................11

      B.    *Affiliated Ute* and *Zandford* Apply And Make Deaton And Image
           Entry Liable Under Rules 10b-5(a) and (c) Even If Deaton And
           Image Entry Said Nothing. ........................................................................12

           1.    The Complaint pleads a claim under Rules 10b-5(a) and (c). .......13

           2.    The Complaint pleads that Deaton's and Image Entry's
                 misdeeds happened in connection with purchase of
                 SourceCorp common stock. .............................................................13

a.    The "in connection with requirement" is met here even though Deaton might have directed his fraud at SourceCorp rather than the market at large or the class defined in the Complaint.....................................................14

b.    This district rejects Deaton's "in connection with" argument. .........................................................................16

3.    The Complaint pleads a presumption of reliance on the scheme or practice that Deaton and Image Entry perpetrated. ......17

**II.    THE COMPLAINT ALLEGES AMPLE FACTS TO SUPPORT A STRONG INFERENCE THAT DEATON ACTED WITH SCIENTER.**.......18

**A.**    The Complaint's Allegations Collectively Add Up To A Strong Inference That Deaton Acted With Scienter................................................18

1.    In making out a strong inference of scienter, the Complaint relies on far more than just the size of SourceCorp's restatement. ..................................................................................20

2.    SourceCorp's SEC filings, including Deaton's $30 million settlement agreement with SourceCorp inextricably tie Deaton to the accounting irregularities at Image Entry.............................21

3.    Deaton's $25 million earn-out agreement with SourceCorp easily helps support a strong inference of scienter ........................22

**B.**    Allegations Based Upon Plaintiffs' Confidential Witnesses Meet Fifth Circuit Standards.............................................................................23

**CONCLUSION** .............................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Adaptive Broadband Sec. Litigation,*
    No. C 01-1092 SC, 2002 WL. 989478 (N.D. Cal. Apr. 2, 2002) .....................................19

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128, 92 S. Ct. 1456 (1972)...................................................................7, 8, 12, 13

*In re Ames Dep't Stores, Inc Stock Litigation,*
    991 F.2d 953 (2d Cir. 1993)...............................................................................................15

*Anixter v. Home-Stake Prod. Co.,*
    77 F.3d 1215 (10th Cir. 1996) ...........................................................................................15

*Barrie v. Intervoice-Brite, Inc.,*
    397 F.3d 249 (5th Cir. 2005) ........................................................................18, 20, 22, 23

*Basic v. Levinson,*
    485 U.S. 224, 108 S. Ct. 978 (1988)..................................................................................17

*In re Cendant Corp. Sec. Litigation,*
    109 F. Supp. 2d 225 (D.N.J. 2000) .....................................................................................1

*Central Bank of Denver, N.A. v First Interstate Bank of Denver, N.A.,*
    511 U.S. 164, 114 S. Ct. 1439 (1994)..................................................................................7

*Chelverus v. Pegasystems, Inc.,*
    59 F. Supp. 2d 226 (D. Mass. 1999) .................................................................................19

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,*
    399 F.3d 651 (6th Cir. 2005) .............................................................................................19

*In re Crossroads System,*
    No. A-00-CA-457 JN, 2001 WL 1401211 (W.D. Tex. Aug. 15, 2001) .............................10

*In re DVI, Inc. Sec. Litigation,*
    No. Civ.A. 03-5336, 2005 WL. 1307959 (E.D. Pa. May 31, 2005) ....................................8

*In re Dynergy, Inc. Sec. Litigation,*
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ..........................................................................10, 11

*In re Enron Corp. Sec., Derivative & "ERISA" Litigation,*
    235 F. Supp. 2d 549 (S.D. Tex. 2002)..........................................................................8, 10, 12

*In re Enron Sec., Derivative & ERISA Litigation,*
258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................................19

*In re Global Crossing, Ltd,*
322 F. Supp. 2d 319 (S.D.N.Y. 2004) ............................................................................17

*Goldstein v. MCI WorldCom,*
340 F.3d 238 (5th Cir. 2003) ...................................................................................20

*Hartsell v. Source Media, Inc.,*
NO. 3:98-CV-1980-M, 2000 WL 422912 (N.D. Tex. Apr. 17, 2000) ...........................16

*In re ICN/Viratek Sec. Litigation,*
87 CIV. 4296, 1996 WL. 164732 (S.D.N.Y. Apr. 6, 1996)............................................10

*In re JWP, Inc. Sec. Litigation,*
928 F. Supp. 1239 (S.D.N.Y. 1996)..............................................................................15

*In re Kidder Peabody Sec. Litigation,*
10 F. Supp. 2d 398 (S.D.N.Y. 1998).........................................................................7, 9, 10

*In re Leslie Fay Cos., Inc. Sec. Litigation,*
871 F. Supp. 686 (S.D.N.Y. 1995) ................................................................................15

*Lovelace v. Software Spectrum, Inc,*
78 F.3d 1015 (5th Cir. 1996) .........................................................................................6

*In re MCT Electric Tech. Shareholder Litigation,*
993 F. Supp. 160 (E.D.N.Y. 1997) ................................................................................10

*McGann v. Ernst & Young,*
102 F.3d 390 (9th Cir. 1996) .........................................................................................15

*Melder v. Morris,*
27 F.3d 1097 (5th Cir. 1994) .........................................................................................19

*In re MicroStrategy Sec. Litigation,*
115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................................19

*Pirraglia v. Novell, Inc.,*
339 F.3d 1182 (10th Cir. 2003) .....................................................................................19

*Provenz v. Miller,*
102 F.3d 1478 (9th Cir. 1996) .......................................................................................19

*Robertson v. Strassner,*

32 F. Supp. 2d 443 (S.D. Tex. 1998) ..............................................................10

*In re Royal Ahold N.V. Sec. & ERISA Litigation,*
351 F. Supp. 2d 334 (D. Md. 2004) ..........................................................8, 13

*S.E.C. v. Texas Gulf Sulphur Co.,*
401 F.2d 833 (2d Cir. 1968) ........................................................................14

*S.E.C. v. Zandford,*
535 U.S. 813, 122 S. Ct. 1899 (2002) .................................................8, 12, 13

*Semerenko v. Cendant Corp.,*
223 F.3d 165 (3d Cir. 2000) ........................................................................15

*Superintendent of Insurance of N.Y. v. Bankers Life & Casualty Co.,*
404 U.S. 6, 92 S. Ct. 165 (1971) ..................................................................14

*In re Texlon Corp. Sec. Litigation,*
133 F. Supp. 2d 1010 (N.D. Ohio 2000) ....................................................19

*In re Triton Energy Ltd. Sec. Litigation,*
No. 5:98-CIV-256, 2001 WL 872019 (E.D. Tex. Mar. 30, 2001) ....................19

*United States v. O'Hagan,*
521 U.S. 642, 117 S. Ct. 2199 (1997) .....................................................14, 15

*In re Vivendi Universal, S.A. Sec. Litigation,*
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..........................................................10

*Wright v. Ernst & Young, LLP,*
152 F.3d 169 (2d Cir. 1998) ........................................................................10

*In re ZZZZ Best Sec. Litigation,*
864 F. Supp. 960 (C.D. Cal. 1994) ........................................................13, 17

## FEDERAL STATUTES

15 U.S.C. § 78j(b) .........................................................................................14

17 C.F.R. § 240.10b-5 ............................................................................7, 13, 14

Fed. R. Evid. 201(f) .........................................................................................6

**OTHER SOURCES**

News In Brief, *Government Agrees Not TO Prosecute MCI*
N.Y. Law J., Vol. 234 (Sept. 2, 2005) ...............................................................................18

Robert A. Prentice, *Locating That "Indistinct" and "Virtually Nonexistent" Line Between
Primary And Secondary Liability Under Section 10(b)*, 75 North Carolina L. Rev.
691, (March 1997) .............................................................................................................10

Verdicts & Settlments, *WorldCom Judge Awards $3.5 Billion To Investors*
Nat'l Law J., Vol. 28, No. 4 (Sept. 26, 2005).....................................................................18

TO THE HONORABLE COURT:

Lead Plaintiff Dale R. Templin and Proposed Named Plaintiff George Reichl submit this brief opposing Bill D. Deaton's ("Deaton") motion to dismiss the Consolidated Amended Complaint (cited as "Complaint ¶ __").

## INTRODUCTION

For over three years, Defendants Deaton and Image Entry inflated and knowingly passed to SourceCorp, Image Entry's parent, revenue figures for Image Entry. They did so with the intention and expectation that SourceCorp incorporate those figures into its publicly-stated financial results. When Deaton's and Image Entry's fraud was exposed, the fallout was considerable: SourceCorp's stock price dropped almost thirty percent in one day; the SEC launched a formal investigation; and SourceCorp ultimately restated over three years of its public financial statements. On or about September 23, 2005, after filing his motion to dismiss, Deaton agreed to pay SourceCorp $30 million (he immediately paid $20 million of that in cash) for what Deaton here characterizes as merely aiding and abetting SourceCorp's wrongdoing.

For the reasons explained in this brief, the Court should reject Deaton's plea for dismissal (along with Image Entry's, made in SourceCorp's brief, since Image Entry's wrongdoing, and thus its liability, are interconnected).[1]

## FACTUAL BACKGROUND

---

[1] Both Deaton and Image rely on a flawed construction of the Supreme Court's decision in *Central Bank*. Image Entry's *Central Bank* argument comes at the end of SourceCorp's brief. Plaintiffs treat both Deaton and Image Entry together in this brief for two reasons: (1) economy since both make the same arguments under *Central Bank*; and (2) at this early stage of the proceedings, Image Entry cannot escape having Deaton's scienter imputed to it. *See In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 233-34 (D.N.J. 2000) (collecting authorities for the proposition that the motion-to-dismiss stage – or, for that matter, summary judgment – is too early to resolve whether a company officer's scienter can be imputed to the company). For these reasons, Plaintiffs believe Deaton and Image Entry stand together at least on this aspect of the motions to dismiss.

SourceCorp, Incorporated ("SourceCorp" or the "Company") used to be called F.Y.I., Incorporated ("F.Y.I.").[2] SourceCorp's common stock has been a publicly-traded on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") since January 1996.[3] In March 2001, SourceCorp bought Image Entry – a company that Deaton headed and started – from Deaton for $32,812,500 in cash and $10,937,500 stock. The stock and additional cash of up to $25,000,000 could be paid out later under an earn-out agreement.[4] Image Entry became SourceCorp's wholly-owned subsidiary.

**Deaton & Image Entry Perpetrate An Accounting Fraud.**

As part of his deal with SourceCorp, Deaton agreed to stay on and continue to run Image Entry in London, Kentucky.[5] SourceCorp promised Deaton that if, over the next three years, Image Entry hit certain earnings targets, that SourceCorp would pay Deaton $25 million in cash and the SourceCorp stock.[6] Over the next three years, Deaton and Image Entry reported to SourceCorp earnings results showing that Image Entry had achieved the earnings necessary to trigger SourceCorp's obligation under the Stock Purchase Agreement, to pay Deaton $25 million in cash and the stock.[7] These earnings results that Deaton and Image Entry reported to SourceCorp were incorporated into consolidated financial results that SourceCorp reported in its

---

[2]    Throughout the rest of this memorandum of law, F.Y.I. and SourceCorp will be referred to as "SourceCorp," without regard to when F.Y.I. actually changed its name to SourceCorp.

[3]    *See* F.Y.I.'s SEC Form 10-Q for fiscal quarter ended Mar. 31, 1996 p.3 (filed May 15, 1996) (attached hereto as Appendix, Exhibit A, pp.3-6).

[4]    *See* Complaint ¶¶ 108-09; F.Y.I.'s SEC Form 8-K, Exhibit 2.20 (filed Apr. 12, 2001) (Stock Purchase Agreement between F.Y.I. and Image Entry, Art. 1.1) (attached hereto as Appendix, Exhibit B, pp. 7-80) (cited as "Stock Purchase Agreement").

[5]    Complaint ¶ 15 (c).

[6]    *See* Stock Purchase Agreement, Art. 1.4; Complaint ¶ 6.

[7]    Complaint ¶ 2, ¶ 5.

public filings with the United States Securities & Exchange Commission ("SEC") for fiscal years 2001, 2002, 2003, and the first two fiscal quarters of 2004.[8]

Based on financial data that Deaton and Image Entry reported to Sourcecorp, SourceCorp paid Deaton the additional $25 million sometime after February 28, 2004.  Unfortunately for SourceCorp shareholders, Deaton and Image Entry engaged in a massive and systematic accounting fraud scheme that lasted from about May 2001 through at least the first half of 2004 so that Deaton could receive his $25 million.[9]  To that end, Deaton and Image Entry shifted expenses to entities that Deaton controlled, *i.e.*, "off-balance-sheet entities" and fraudulently increased Image Entry's earnings by substantial amounts.[10]

In addition to shifting expenses, Deaton and Image Entry recognized revenue absent conditions necessary to do so without violating Generally Accepted Accounting Procedures ("GAAP") and SourceCorp's company policy.  Before Deaton and Image Entry could recognize revenue from contracts with customers, the following conditions must exist:  (i) persuasive evidence of a contract; (ii) price must be fixed or determinable;  (iii) delivery must occur or services must be rendered; and (iv)  collection must be reasonably assured.  Deaton and Image Entry recognized revenue when "one or more of the aforementioned revenue recognition conditions" was not present.[11]

**SourceCorp Reveals Deaton & Image Entry's Fraud.**

On October 27, 2004, SourceCorp shocked investors with the following disclosure: investors should not rely on the Company's consolidated financial statement for fiscal year

---

[8]    Complaint ¶¶ 117, 118.

[9]    Complaint ¶ 111.

[10]    Complaint ¶ 6, ¶¶ 20, 21, ¶ 110.

[11]    Complaint ¶ 20, ¶ 110.

ended December 31, 2003 and the quarterly statements for the first half of 2004. SourceCorp attributed this bad news to an operating subsidiary's, *i.e.*, Image Entry's, failure to follow GAAP in recognizing revenue from various contracts with customers.[12] SourceCorp would have to re-state these results. This bad-news announcement dropped SourceCorp's stock price from $22.21 per share (the closing price on October 26, 2004)[13] to as low as $14.92 per share on October 27, 2004.[14] The volume of shares traded on October 27, 2004 the day of SourceCorp's bad-news announcement was 833,200 shares – forty-two times larger than the volume that traded the day before.[15]

**The Bad News Continues**

The bad news continued into January 2005. On January 18, 2005, the Company announced that the SEC had launched a formal investigation into the circumstances surrounding SourceCorp's need to restate earnings for fiscal year 2003 and the first half of fiscal year 2004. In addition to SEC troubles, SourceCorp disclosed that NASDAQ might de-list SourceCorp's stock from trading on the NASDAQ exchange.[16] Three days later, SourceCorp announced that, in addition to not being able to rely on SourceCorp's previously reported financial results for fiscal year 2003 and for the first half of fiscal year 2004, investors also could no longer rely upon

---

[12]    *See* SourceCorp's SEC Form 8-K, Exhibit 99.1 (filed Oct. 27, 2004) (attached hereto as Appendix, Exhibit C, pp 81-90).

[13]    *See* Appendix, Exhibit D, p. 92 (chart explaining price and volume for SourceCorp stock on October 26, 2005) (downloaded Nov. 13, 2005 from www. SourceCorp.com/ SourceCorp/InvestorRelations/StockHistory?sm=StockHistory).

[14]    *See* Appendix, Exhibit D, p. 93 (chart explaining price and volume for SourceCorp stock on October 27, 2004) (downloaded Nov. 13, 2005 from www. SourceCorp.com/ SourceCorp/InvestorRelations/StockHistory?sm=StockHistory).

[15]    Complaint ¶ 2.

[16]    *See* SourceCorp's SEC Form 8-K, Exhibit 99.1 (filed Jan. 19, 2005) (attached hereto as Appendix, Exhibit E, pp. 94-100); Complaint ¶ 3 (SEC launches formal investigation).

SourceCorp's reported results for fiscal years 2001 and 2002. Those results, along with results from 2003 and the first half of 2004, would have to be restated.[17]

**SourceCorp Restates Earnings And Discusses The Fiasco With Deaton & Image Entry.**

On March 23, 2005, SourceCorp announced that its restatement was done. The results were staggering for a company of SourceCorp's size. For example, for the entire restatement period, *i.e.*, fiscal years 2001 through 2003 and the first half of fiscal year 2004, the restatement yielded a $33.9 million, or a 38.1%, decrease in income from continuing operations before taxes—a material sum by any measure.[18] During a March 23, 2005 conference call with analysts, SourceCorp discussed the accounting-fraud fiasco.[19] There, SourceCorp reiterated that "certain members of the operating subsidiary's management allegedly diverted expenses to entities they controlled, but that are unrelated to SourceCorp, resulting in the omission of the related expenses from the operating subsidiary's and SourceCorp's reported financial results."[20] SourceCorp's Chief Executive Officer ("CEO"), Ed Bowman ("Bowman") said, "We quickly dealt with the individuals who were directly implicated and are evaluating what additional steps to take."[21]

**SourceCorp Deals With Deaton & Image Entry.**

Sometime during September or October 2004, about when SourceCorp first warned investors not to rely on previously reported financials, Deaton and Image Entry's head of

---

[17]    *See* SourceCorp's SEC Form 8-K, Exhibit 99.1 (filed Jan. 21, 2005) (attached hereto as Appendix, Exhibit F, pp. 101-114).

[18]    Complaint ¶ 23, ¶ 119.

[19]    *See* SourceCorp's SEC Form 8-K, Exhibit 99.1 (filed Mar. 24, 2005) (transcript of Mar. 23, 2005 conference call between SourceCorp leadership and analysts) (attached hereto as Appendix, Exhibit G, pp. 115-155).

[20]    Appendix (Exhibit G) at 136.

[21]    Appendix (Exhibit G) at 139.

accounting, Michael Sulfridge, left Image Entry.[22]    Faced with indisputable and massive liabilities, Deaton recently agreed to pay SourceCorp $30 million, $20 million in cash immediately.[23]  The other $10 million was (or will soon be) paid by returning SourceCorp stock to the Company and by subsequent cash payments.

To guarantee payment, Deaton gave SourceCorp an interest in his considerable real estate holdings, including property that is likely Deaton's personal home in London, Kentucky.[24] And it appears that Deaton did so without SourceCorp having to sue Deaton to recover the $25 million paid to Deaton as an earn-out.  SourceCorp's first announcement of its settlement with Deaton came in a late September 2005 press release, shortly after Deaton filed his motion to dismiss.[25]  Now, the entire settlement agreement is public record; SourceCorp attached it as an exhibit to the Company's most recent SEC Form 10-Q.

No one can seriously suggest that if Deaton had not engaged in manipulative acts or misled shareholders – even indirectly, and thus violated Exchange Act § 10(b) – that Deaton, a sophisticated businessman, would have cut SourceCorp a $20,000,000 check and given another $10,000,000 in consideration to settle with SourceCorp even before being sued by SourceCorp. Yet that is just what Deaton did.  Still, Deaton would have this Court accept that, given the Complaint's allegations and Deaton's extraordinary settlement with SourceCorp, of which the

---

[22]    Complaint ¶ 112 (Deaton and Sulfridge leave Image Entry in September or October 2004).

[23]    *See* SourceCorp's SEC Form 10-Q for period ended Sept. 30, 2005, Exhibit 10.1 at 2 (filed Nov. 9, 2005) (Settlement Agreement with Deaton) (attached hereto as Appendix, Exhibit H, pp. 156-185).

[24]    *See* Appendix (Exhibit H) at 176 (Deaton giving SourceCorp interest in residential property at 484 Woods Edge in London, Kentucky).

[25]    *See* SourceCorp's SEC Form 8-K, Exhibit 99.1 (filed Sept. 29, 2005) (announcing $30 million settlement) (attached hereto as Appendix, Exhibit I, pp. 186-190).

Court may take judicial notice,[26] that Deaton faces no Exchange Act liability for his acts that led to SourceCorp's restatement of earnings, an SEC investigation, a de-listing proceeding with NASDAQ, and shareholders like Plaintiffs here losing tens of millions of dollars. In short, Deaton suggests an absurd result.

## I.  DEATON AND IMAGE ENTRY FACE LIABILITY AS PRIMARY VIOLATORS UNDER THE EXCHANGE ACT AND RULE 10b-5.

Deaton argues that under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* ("*Central Bank*"),[27] he has no liability under The Securities Exchange Act ("Exchange Act") § 10(b) or Exchange Act Rule 10b-5.[28] Deaton argues that his *Central Bank* defense rests on the proposition that the Complaint "lacks any allegation suggesting that Mr. Deaton had . . . any role in the public statements by SourceCorp . . . [and that] the allegations concerning Mr. Deaton describe entirely non-public events involving him, SourceCorp, and Image Entry." (Deaton's Br. p. 2). Deaton proceeds that, without a public statement directly attributed to him, there is nothing for the Plaintiffs to allege that they relied upon vis-à-vis Deaton; nor does any connection exist between Deaton's conduct and the Plaintiffs' class period purchases of SourceCorp common stock at inflated prices. (Deaton's Br. pp. 10-16). For the following reasons, Deaton's and Image Entry's *Central Bank* defense shields neither from Exchange Act liability:

---

[26]    The Court can take judicial notice of SourceCorp's SEC filings. *See Lovelace v. Software Spectrum, Inc,* 78 F.3d 1015, 1017-18 (5th Cir. 1996); Fed. R. Evid. 201(f).

[27]    511 U.S. 164, 114 S. Ct. 1439 (1994).

[28]    17 C.F.R. § 240.10b-5.

*Central Bank* does not (and cannot) shield those violators who communicate false statements to other parties, with the intention and expectation that those other parties, *i.e.*, SourceCorp, would likely convey those false statements to the public.[29]

*Second*, both Deaton and Image Entry face liability under *Affiliated Ute*[30] and *Zandford*,[31] which held that Rules 10b-5(a) and (c) can impose liability even if the fraudsters say nothing.[32]

### A.    *Central Bank* Does Not Shield Fraudsters Who Provide False Information Or Data To Other Actors Intending And Expecting That Those Other Actors Will Disseminate That False Information To The Market.

Deaton relies heavily on an interpretation of *Central Bank* that, on these facts, courts reject. Courts – including Texas federal courts – reject Deaton's interpretation of *Central Bank* because they must. Courts must because Exchange Act § 10(b) nowhere requires a false public statement to be directly attributed to Deaton. Rather, it is enough under § 10(b) that Deaton speak "indirectly" to the market, which is precisely what he and Image Entry did.

Courts reject Deaton's interpretation of *Central Bank* also because neither Deaton nor Image Entry can credibly characterize themselves as "secondary actors" like lawyers, accountants, and investment bankers sometimes can. Deaton and Image Entry are not merely

---

[29]    *See, e.g., In re Kidder Peabody Sec. Litig.* ("*Kidder*"), 10 F. Supp. 2d 398, 407-08 (S.D.N.Y. 1998) (rejecting Deaton's *Central Bank* argument and explaining why that argument yields "bizarre" results and undermines the Exchange Act's "fundamental purpose").

[30]    *Affiliated Ute Citizens of Utah v. United States* ("*Affiliated Ute*"), 406 U.S. 128, 152-53, 92 S. Ct. 1456, 1471-72 (1972) (concluding that Court of Appeals "erred" when, based on absence of statements by individual defendants, the Court of Appeals rejected claims under Rules 10b-5(a) and (c)).

[31]    *See S.E.C. v. Zandford* ("*Zandford*"), 535 U.S. 813, 822-23, 122 S. Ct. 1899, 1905 (2002) (No affirmative misrepresentation necessary for § 10(b) liability.); *see also In re Enron Corp. Sec., Derivative & "ERISA" Litig.* ("*Enron*"), 235 F. Supp. 2d 549, 585 (S.D. Tex. 2002) (explaining *Zandford* as "ma[king] crystal clear that a misrepresentation need not be involved and that a suit could be based on Rule 10b-5(a) or (c)").

[32]    *See Enron*, 235 F. Supp. 2d at 585; *In re Royal Ahold N.V. Sec. & ERISA Litig.* ("*Royal Ahold*"), 351 F. Supp. 2d 334, 372 (D. Md. 2004) (citing and quoting *Affiliated Ute*, 406 U.S. at 153); *see also In re DVI, Inc. Sec. Litig.*, No. Civ.A. 03-5336, 2005 WL 1307959, at *2, 10 (E.D. Pa. May 31, 2005) (rejecting defendants' arguments against "scheme" liability under Rules 10b-5(a) and (c) in accounting-fraud case where, as here, defendant overstated revenues and understated expenses).

"affiliated" with SourceCorp, the direct speaker here. Rather, both are intimately related to the direct speaker and a part of the speaker's daily operations; they did not "help" SourceCorp mislead the market via inflated financial results. Deaton and Image Entry stand as the original and knowing source of the inflated financial results and the resulting fraud on the market. Consequently, when such actors give false information to the actor (in this case, SourceCorp) who speaks directly to the market, as happened here, those actors face primary liability under the Exchange Act as happened in *Kidder*, *Enron*, and other decisions discussed below. In short, contrary to what Deaton now says in his attempt to avoid liability for his fraud, he did in fact speak to the market; he and Image Entry knowingly used SourceCorp as their mouthpiece.

**1.    Like the defendants in *Kidder*, Deaton and Image Entry face primary liability under the Exchange Act because they reported inflated financial results to the corporate parent.**

*Kidder*, a post-*Central Bank* decision that Deaton studiously avoids, stands squarely on all fours with this case. Here, as in *Kidder*, an officer at a subsidiary orchestrated and perpetrated an accounting-fraud scheme that significantly inflated the subsidiary's revenues and earnings. The subsidiary then reported those false numbers to the parent, and the parent then incorporated the subsidiary's false numbers into its own consolidated financial results – consolidated financial results that were then publicly reported to the SEC and to the market. Here, as in *Kidder*, the impact on the parent's financial results was substantial.[33] And here, as in *Kidder*, the avarice of one official at a subsidiary drove the scheme and yielded substantial

---

[33]    *Compare Kidder*, 10 F. Supp. 2d at 402, 405 ("During the relevant time period, [the parent's] statements including financial information related to [the subsidiary]....In 1993, Kidder's profits were inflated by 45%.") *with* Complaint ¶ 2 ("Deaton and Image Entry passed Image's inflated earnings information to SourceCorp.") and Complaint ¶ 110 (fraudulent financials inflated SourceCorp's class period income by $33.9 million), ¶ 119 (fraudulent financials inflated SourceCorp's class period income from continuing operations before taxes by a whopping 38.1%).

financial rewards for that official as well as the false impression that the subsidiary was performing far better than was actually the case.[34]

*Kidder* shows that Deaton's and Image Entry's *Central Bank* argument actually had more force before *Central Bank* than it does today after *Central Bank*. Before the Supreme Court issued its opinion in *Central Bank*, *Kidder* dismissed Exchange Act claims against the subsidiary and its officers because the Court concluded that the subsidiary and its officers "could not be held liable for statements attributed to [the parent] or securities analysts."[35]  But after *Central Bank*, *Kidder* reconsidered this decision and reinstated the Exchange Act claims against the subsidiary and its officers because *Kidder* concluded that "where the defendant has . . . used another actor to deliver the message, the defendant may still be liable as a primary violator."[36]

The same result should prevail here via the same rationale as in *Kidder* where, as here, the defendant is a corporate insider with an active daily role in the fraudulent scheme.[37]

### 2.    Texas Federal Courts Follow The Rationale That Drove *Kidder*.

Deaton's *Central Bank* defense arises often when plaintiffs seek to impose liability on corporate and individual defendants for statements actually made by securities analysts, *i.e.*,

---

[34]    *Compare Kidder*, 10 F. Supp. 2d at 403 ("For these efforts, [the subsidiary's official] was awarded a year-end performance bonus of $2 million and promoted to Senior Vice President.") and *Kidder*, 10 F. Supp. 2d at 404-05 (Subsidiary official's fraud yields millions in false revenues and profits for parent) *with*  Complaint ¶ 6 (For his efforts and perceived successes, Deaton receives $25 million) and Complaint ¶ 110 (fraudulent financials inflated SourceCorp's class period income by $33.9 million).

[35]    *Kidder*, 10 F. Supp. 2d at 406.

[36]    *Id.* at 407 (collecting post-*Central Bank* authorities that supported *Kidder*'s result).

[37]    After the district court ruled in *Kidder*, the Second Circuit ruled in *Wright v. Ernst & Young, LLP*, 152 F.3d 169 (2d Cir. 1998). *Wright* established the kind of "bright-line" rule that Deaton urges here. Deaton might suggest that *Wright* somehow undermines *Kidder*. But it does not. This is so because even after *Wright*, district courts in the Second Circuit applying *Wright* reject Deaton's *Central Bank* defense. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 191-92 (S.D.N.Y. 2003) ("Unlike the accountants in *Shapiro* and *Wright*, [the defendant] was not a person merely affiliated with the defendant corporation, but rather was a 'clearly cognizable corporate insider[] with [an] active daily role[].'") (collecting S.D.N.Y. authorities that reject Deaton's *Central Bank* defense).

when fraudsters like Deaton carry out their fraud through public statements of other parties.[38]  In

such circumstances, Texas federal courts routinely impose Exchange Act liability.[39]  Texas

federal courts do so because, quite simply, § 10(b) makes liable those securities-fraud defendants

who, like Deaton, "indirectly" defraud investors via statements made through others.[40]  *Enron* so

ruled at the SEC's urging.

### 3.    Texas Federal Courts Accept The SEC's Argument Rejecting Deaton's Proposed Application Of *Central Bank.*

The *Enron* defendants argued without success the same kind of *Central Bank* arguments

about public statements, no reliance, and no connection with securities transactions that Deaton

here offers.  Recognizing that *Central Bank* arguments like Deaton's threaten the broad remedial

scope of the Exchange Act and actually go far beyond *Central Bank* itself, the SEC moved in

*Enron* for leave to file an amicus brief that it had previously filed in the Third Circuit.  Judge

Harmon granted the motion.  Ultimately, Judge Harmon accepted the SEC's arguments, which

led her to reject the very *Central Bank* arguments that Deaton here offers.[41]

---

[38]    *See In re ICN/Viratek Sec. Litig.*, NO. 87 CIV. 4296, 1996 WL 164732, at *3-5 (S.D.N.Y. Apr. 6, 1996) (rejecting Deaton's *Central Bank* defense when company officials provided data or information to analysts that analysts then conveyed to the market without attributing that data to company officials); *In re MCT Elec. Tech. Shareholder Litig.*, 993 F. Supp. 160, 161 (E.D.N.Y. 1997) (reconsidering and rejecting *Central Bank* defense); *see also* Robert A. Prentice, *Locating That "Indistinct" and "Virtually Nonexistent" Line Between Primary And Secondary Liability Under Section 10(b)*, 75 NORTH CAROLINA L. REV. 691, 731 (March 1997) ("If others are to be liable for 'indirectly' committing fraud, then liability must extend beyond the speakers themselves.").

[39]    *In re Crossroads Sys.*, No. A-00-CA-457 JN, 2001 WL 1401211, at *3 (W.D. Tex. Aug. 15, 2001) (denying motion to dismiss where, as here, "[s]ecurities fraud defendants . . . carr[y] out [the] alleged fraud through the public statements of third parties"); *Robertson v. Strassner*, 32 F. Supp. 2d 443, 450 (S.D. Tex. 1998) (same).

[40]    *E.g., Enron*, 235 F. Supp. 2d at 587, 589 & n.30 (citing Supreme Court decisions and accepting the SEC's argument that *Central Bank* defenses like Deaton's must be rejected because they misread *Central Bank*).  Deaton points to *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804 (S.D. Tex. 2004) as Texas federal authority for accepting Deaton's *Central Bank* arguments.  Unfortunately for Deaton, the Complaint here alleges far more than did the *Dynegy* Complaint.  The *Dynegy* Complaint accused Citigroup of helping Dynegy commit fraud. *Dynegy*, 339 F. Supp. 2d at 916.  The Complaint here nowhere alleges that Deaton "helped" SourceCorp commit fraud.  Rather, the Complaint here alleges that Deaton was the original source for (and cause of) any fraud committed concerning SourceCorp's consolidated financial statements during the class period. Complaint ¶ 2.

[41]    *See id.*

Judge Harmon accepted SEC amicus arguments: (1) violators like Deaton and Image Entry who use third parties to convey false information to the market "make" a false statement, albeit "indirectly;" and (2) securities plaintiffs plead reliance by pleading that they relied on a misrepresentation, not by pleading that they relied on the fact thtat some particular person make the misrepresentation.

Deaton and Image Entry argue that, under *Central Bank*, "they" made no misrepresentation because "they" did not directly speak to the market. The SEC responded to this argument by saying:

> This view of *Central Bank* is incorrect. Nothing in *Central Bank* indicates that when the Supreme Court used the word "makes," it meant that only persons who sign documents or are otherwise ident- ified to investors can be primarily liable. Indeed, such an interpreta- tion would be inconsistent with the language of Section 10(b), which makes it unlawful "for any person, *directly or indirectly* * * * to use or employ * * * any deceptive device or contrivance." A person who creates a misrepresentation, but takes care not to be identified publicly with it, "indirectly" uses or employs a deceptive device or contrivance and should be liable.[42]

Deaton argues that the Complaint fails to plead reliance because investors did not know of Deaton's and Image Entry's involvement with the misstated financials. The SEC responded to that argument by saying: "The reliance a plaintiff in a securities fraud action must plead is reliance on a misrepresentation, not on the fact that a particular person made that misrepresentation."[43] Judge Harmon thus rejected defendants' *Central Bank* arguments and accepted the SEC's view. This Court should do likewise.[44] The SEC's view of Exchange Act §

---

[42] SEC Amicus Brief at 12 (attached hereto as Appendix (Exhibit J) at 207).

[43] SEC Amicus Brief at 15 (attached hereto as Appendix (Exhibit J) at 209).

[44] *See Zandford*, 535 U.S. at 820, 122 S. Ct. at 1903 (collecting Supreme Court authorities); *Enron*, 235 F. Supp. 2d 588-89 ("Because § 10(b) expressly delegated rule-making authority to the [SEC], which [the SEC]

10(b) and Rule 10b-5 "is entitled to deference if it is reasonable."[45] *Enron*'s accepting the SEC's interpretation of Rule 10b-5 and rejecting of Deaton's *Central Bank* defense seems more than reasonable since it continues to hold responsible those like Deaton and Image Entry who stand as the original and knowing source of false statement but who use other actors to publicly voice their false statements. This approach maintains the bar to private liability for aiding and abetting that *Central Bank* imposed for secondary actors yet continues to subject perpetrators to Exchange Act liability.[46]

**B.    *Affiliated Ute* and *Zandford* Apply And Make Deaton And Image Entry Liable Under Rules 10b-5(a) and (c) Even If Deaton And Image Entry Said Nothing.**

Both *Affiliated Ute* [47] and *Zandford* [48] stand for the proposition that a fraudster can face liability under Rules 10b-5(a)[49] and 10b-5(c)[50] even if that fraudster said nothing directly to the public.[51]  Actions alone are enough.[52]  Under Rule 10b-5(a) actions that qualify as a "device,

---

exercised *inter alia* in promulgating Rule 10b-5, this Court accords considerable weight to the SEC's construction of the statute[.]") (citing and quoting various Supreme Court decisions, including *Zandford*).

[45]    *See Zandford*, 535 U.S. at 820.  For the Court's convenience, Plaintiffs have attached as Appendix, Exhibit J, pp. 191-215, to this memorandum a copy of the SEC's amicus brief that Judge Harmon found so helpful in resolving *Central Bank* arguments like those Deaton here offers, and we here adopt the SEC's amicus arguments in *Enron*.

[46]    *See Enron*, 235 F. Supp. 2d at 589 & n.30, 590-591 ("This Court finds that the SEC's approach to liability under § 10(b) and Rule 10b-5(b) is well reasoned and reasonable, balanced in its concern for protection of victimized investors as well as for meritlessly harassed defendants … [m]oreover, it is consistent with … *Central Bank*.").

[47]    406 U.S. 128, 92 S. Ct. 1456 (1972).

[48]    535 U.S. 813, 122 S. Ct. 1899 (2002).

[49]    17 C.F.R. § 240.10b-5 (b) (scheme or artifice liability).

[50]    17 C.F.R. § 240.10b-5 (c) (course of business liability).

[51]    *See Affiliated Ute*, 406 U.S. at 1471-72, 92 S. Ct. at 152-53 (rejecting defendants' argument that Rule 10b-5(a) or (c) liability requires the defendant to make a misrepresentation of material fact); *Zandford*, 535 U.S. at 822, 122 S. Ct. at 1904-05.

scheme, or artifice to defraud" lead to Exchange Act liability;[53] as do actions that amount to an "act, practice, or course of business" that "operates . . . as a fraud or deceit upon any person" under Rule 10b-5(c).[54]

### 1.    The Complaint pleads a claim under Rules 10b-5(a) and (c).

To state a claim under Rule 10b-5(a) or (c), defrauded investors like the Plaintiffs here need plead the following five elements:  (1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter.[55]  In his attack on Plaintiffs' Rule 10b-5 claims, Deaton argues that the Complaint does not plead elements (2) and (3), supra. – that the Complaint pleads neither reliance nor that the misdeeds occurred in connection with purchase or sale of SourceCorp common stock.  (Deaton's Br. pp. 10-16).

### 2.    The Complaint pleads that Deaton's and Image Entry's misdeeds happened in connection with purchase of SourceCorp common stock.

Both Exchange Act § 10(b) and Rule 10b-5 require that the misstatement, omission, scheme, or act happen "directly or indirectly. . .in connection with the purchase or sale of a security."[56]  Courts often refer to this as the "in connection with requirement,"[57] and when they

---

[52]    *See id.; see also In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 971-72 (C.D. Cal. 1994) (explaining how broad the coverage of Rules 10b-5(a) and (c) is and that "the terms of the statute and rule extend liability to all participants in any scheme or device that operates as a fraud on investors") (collecting authorities).

[53]    *See Affiliated Ute*, 406 U.S. at 1471-72, 92 S. Ct. at 152-53.

[54]    *See id.*

[55]    *See Royal Ahold*, 351 F. Supp. 2d at 372 (quoting *In re Global Crossing, Ltd.  Sec. Litig.*, 322 F. Supp. 2d 319, 329 (S.D.N.Y. 2004)).

[56]    15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

[57]    *See United States v. O'Hagan*, 521 U.S. 642, 655-56, 117 S. Ct. 2199, 2209 (1997).

do, they do not impose the technical reading that Deaton here urges. Rather, they read and apply the "in connection with requirement" quite liberally to ensure that § 10(b) and Rule 10b-5 capture the endless array of ever-changing schemes that fraudsters like Deaton employ.[58]  In so doing, courts ensure that the Exchange Act's broad remedial purposes are not frustrated by arguments for the kind of restrictive and technical application that Deaton urges on the Court.

Seeking to escape accountability for his fraud on the Plaintiffs, Deaton argues that whatever he did, he did not do it such that his deeds coincided with any purchase of SourceCorp common stock by the class, and thus Deaton says, the Plaintiffs have not alleged any wrongdoing by Deaton in connection with the purchase or sale or any security.  (Deaton's Br. p. 15).  Deaton errs.

> **a.    The "in connection with requirement" is met here even though Deaton might have directed his fraud at SourceCorp rather than the market at large or the class defined in the Complaint.**

Whether Deaton directed his fraud at public shareholders or at SourceCorp's coffers, Deaton's wrongdoing still meets the "in connection with requirement."  This is so because, as the United States Supreme Court has said in broadly construing the "in connection with requirement," "'a fraud or deceit can be practiced on one person, with resultant harm to another person or group of persons.'"[59]  Here, Deaton might have intended to defraud SourceCorp out of the $25 million in earn-out payments.  He accomplished that fraud by breaching his fiduciary duty of loyalty to accurately report Image Entry's earnings.

---

[58]    *See, e.g., Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7, 92 S. Ct. 165, 168 n.7 (1971); *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 859 (2d Cir. 1968) (en banc) (Thomas G. Corcoran, a spokesperson for the Roosevelt Administration, described § 10(b) as a "catch-all" that was necessary "to deal with new manipulative devices.") (quoting Stock Exchange Regulation, Hearings before the House Committee on Interstate and Foreign Commerce, 73rd Cong., 2d Sess. 115 (1934).
[59]    *O'Hagan*, 521 U.S. at 656, 117 S. Ct. at 2209.

That Deaton directly defrauded SourceCorp does mean that he and Image Entry did not also harm, and thus defraud, the class. And "it is irrelevant that the misrepresentations were not made for the purpose or the object of influencing the investment decisions of market participants."[60]  *Central Bank* did nothing to alter this.[61]  It is enough that Deaton's and Image Entry's false statements came in the form financial results published to investors in SEC Forms 10-K's and 10-Q's.[62]  This is so because those false financial statements affected the integrity of the securities markets;[63]  Deaton and Image Entry intended and expected those statements would be included in SourceCorp's consolidated financials;[64]  and those financials were material statements of a kind upon which investors would rely; in short, they perpetrated a fraud-on-the-market. That satisfies the "in connection with" requirement because every share of SourceCorp common stock purchased during the class period was tainted by Deaton's and Image Entry's false statements made via SourceCorp's consolidated financials.[65]

Additionally, Deaton's "in connection with" argument simply recasts Deaton's first argument that SourceCorp, not he, spoke to the market. Plaintiffs have already debunked that

---

[60]    *See, e.g., Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000) (collecting authorities).

[61]    *See In re Leslie Fay Cos., Inc. Sec. Litig.*, 871 F. Supp. 686, 694-97 (S.D.N.Y. 1995) (explaining why *Central Bank* did not alter "in connection with" analysis in place since *Texas Gulf Sulphur*, supra.).

[62]    *See, e.g., McGann v. Ernst & Young*, 102 F.3d 390, 397 (9th Cir. 1996) (defendant "acts 'in connection with' securities trading when it produces [information] that it knows its client will include in the Form 10-K, . . . *Central Bank* did not overturn this traditional understanding of direct liability under § 10(b)") (collecting authorities).

[63]    *See, e.g., In re JWP, Inc. Sec. Litig.*, 928 F. Supp. 1239, 1251 (S.D.N.Y. 1996) ("At least in fraud-on-the-market cases, the Second Circuit has held that misrepresentations that affect the integrity of the securities market . . . satisfy the 'in connection with requirement.'") (citing *In re Ames Dep't Stores, Inc. Stock Litig ("Ames")*, 991 F.2d 953, 965-66 (2d Cir. 1993)).

[64]    *See, e.g., Ames*, 991 F.2d at 957-58; *McGann*, 102 F.3d at 397.

[65]    *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1227 (10th Cir. 1996) (Exchange Act liability sustained and "in connection with" challenge rejected because defendant knew false information it provided to issuer would reach the investing public).

argument because, as Plaintiffs showed earlier, Deaton and Image Entry (like the defendants in *Kidder*) indirectly spoke to the market through SourceCorp's consolidated financials. Neither Deaton nor SourceCorp can seriously suggest that SourceCorp's consolidated financials were not statements made in connection with the purchase or sale of SourceCorp common stock. To do so would assail a panoply of caselaw holding companies liable for accounting fraud. Thus, if Deaton succeeds with his "in connection with" argument (and he should not), he will have succeeded in avoiding liability because he did not directly speak to the market – because SourceCorp, not he, made false statements to the market about SourceCorp's consolidated results even though Deaton and Image Entry knowingly supplied the admittedly false information. And that simply cannot be since, under both Exchange Act § 10(b) and Rule 10b-5, Deaton and Image Entry face liability even if they only spoke "indirectly" to the market.

### b.      This district rejects Deaton's "in connection with" argument.

Courts in this district reject such "in connection with" arguments where, as here, the Complaint charges a defendant with a primary violation, as opposed to aiding and abetting, which *Central Bank* forbids. In *Hartsell v. Source Media, Inc.*,[66] Judge Buchmeyer, rejected accounting firm Ernst & Young's ("E&Y") "in connection with" argument because there, as here, "Plaintiffs are not alleging that [defendant] aided and abetted [the company's] § 10(b) violations[;] [i]nstead, Plaintiffs allege that [defendant] engaged in a primary violation of Rule 10b-5."[67] Consequently, Judge Buchmeyer rejected E&Y's "in connection with" argument. This court should do likewise because, like the *Hartsell* plaintiffs, the Plaintiffs here charge Deaton and Image Entry as primary violators, not aiders and abettors.

---

[66]      NO. 3:98-CV-1980-M, 2000 WL 422912 (N.D. Tex. Apr. 17, 2000).

[67]      2000 WL 422912, at *4.

### 3.    The Complaint pleads a presumption of reliance on the scheme or practice that Deaton and Image Entry perpetrated.

This is a fraud-on-the-market case.[68]   The Complaint so alleges.  To that end the Complaint alleges that SourceCorp's stock traded on an efficient market that quickly absorbed all public information about SourceCorp and incorporated that information into the price of SourceCorp common stock.[69]  The Complaint also alleges that the market price of SourceCorp's common stock was artificially inflated by Deaton's and Image Entry's scheme or practice of giving inflated earnings results to SourceCorp, which were reported to the SEC and to the investing public via SourceCorp's consolidated financial statements.[70]  On these allegations, which the Court counts as true for now, reliance is presumed even where, as here, the reliance comes from the market itself when the market relies on the scheme.[71]

Here, Deaton's and Image Entry's scheme inflated the price of SourceCorp common stock during the class period.  Whether the Plaintiffs themselves relied on the market price or whether the market relied on (and was manipulated or affected by) Deaton's and Image Entry's scheme, reliance is presumed in this fraud-on-the-market case.  Deaton's contentions otherwise again merely recast his *Central Bank* defense that the Complaint directly attributes no public

---

[68]      *See Basic v. Levinson*, 485 U.S. 224, 241-42, 108 S. Ct. 978, 988-89 (1988) ("Succinctly put[,] '[t]he fraud-on-the-market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.'") (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

[69]      Complaint ¶ 2 (SourceCorp stock price fell dramatically immediately upon bad-news announcement); Complaint ¶ 25 (efficient market indicators alleged).

[70]      Complaint ¶ 24, ¶ 27, ¶ 115 (SourceCorp stock price inflate by misstatements.).  *See In re Global Crossing*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004) (discussing reliance and noting that "[s]chemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within the language of section 10(b)[.]").

[71]      *See ZZZZ Best*, 864 F. Supp. at 973 ("[T]he market's overall reliance on the Z Best fraudulent scheme . . . is sufficient to satisfy the reliance element in Rule 10b-5(a) & (c) claims.").

statement to him – a defense that wilts in the light of decisions cited in Part I. A., *e.g.*, *Kidder*,

*Viratek*, and *Enron*, with *Enron* adopting the SEC's amicus opposition to Deaton's *Central Bank*

defense.

## II.   THE COMPLAINT ALLEGES AMPLE FACTS TO SUPPORT A STRONG INFERENCE THAT DEATON ACTED WITH SCIENTER.

Deaton's opening salvo on the Complaint's scienter allegations, cites for support

decisions involving WorldCom, a *spectacular* fraud that cost investors billions, settled for over

$6 billion, and led to WorldCom's former Chief Executive Officer Bernard Ebbers's drawing a

twenty-five year jail term.[72]   (Deaton's Br. p.19).   WorldCom's former Chief Financial Officer,

Scott Sullivan, is also on his way to prison for five years after testifying against Mr. Ebbers.[73]

While this case pales in comparison to *WorldCom* in scope and gravity, it nonetheless presents

another very real fraud on the market.   Deaton's reliance on *WorldCom* only spotlights Deaton's

fraud.

### A.   The Complaint's Allegations Collectively Add Up To A Strong Inference That Deaton Acted With Scienter.

Allegations about scienter must be considered collectively. Deaton's attack on the

Complaint's scienter allegations proceeds as if each allegation, or each category of allegations

stand alone.   But they do not stand alone under the Fifth Circuit's decision in *Barrie v.

Intervoice-Brite* ("*Barrie*").[74]   Rather, under *Barrie*, the Complaint's scienter allegations, listed

---

[72]      *See* Verdicts & Settlements, *WorldCom Judge Awards $3.5 Billion To Investors*, NAT'L LAW J., Vol. 28, No.4 (Sept. 26, 2005) (attached hereto as Appendix, Exhibit K, pp. 216-217).

[73]      *See* News In Brief, *Government Agrees Not To Prosecute MCI*, N.Y. LAW J., Vol. 234 (Sept. 2, 2005) (attached hereto as Appendix, Exhibit L, pp. 218-220).

[74]      *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (reversing in part district court's dismissal of scienter allegations because district court failed to consider those allegations collectively).

below along with recent developments that the Court may judicially notice, stand together and

say in unison that Deaton indeed acted with scienter:

- Deaton and Image Entry's former head of accounting left amidst the restatements and investigations. SourceCorp executives would later say that they "dealt quickly with the individuals who were directly implicated[,]" leaving little doubt that Deaton was, in fact, "directly implicated." (Complaint ¶¶112-113); (Exhibit G at 20).[75]

- SourceCorp admitted that Deaton, an individual who was "directly implicated," and Image Entry violated GAAP for at least three years. (Complaint ¶¶ 20-21, ¶¶ 34-36, ¶ 117).[76]

- SourceCorp admitted that Deaton and Image Entry violated SourceCorp's revenue-recognition policy for at least three years. (Complaint ¶¶ 20-21, ¶¶ 34-36, ¶ 117).[77]

- Deaton's and Image Entry's accounting fraud led to a restatement that, for the three-year class period, amounted to 38.1% of income from continuing operations. (Complaint ¶ 119).[78]

- Deaton personally profited from the fraud, *i.e.*, $25 million, which alone amounted to a 76% additional premium on the $32 million-plus in cash that SourceCorp paid for Image Entry. (Complaint ¶ 7, ¶ 15(c), ¶ 111, ¶ 113).[79]

---

[75]     *See In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) ("corporate reshuffling" as "financials were being restated and as [the company] was conducting its own investigation . . . add[s] one more piece to the scienter puzzle").

[76]     *See In re Enron Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 626 n.55 (S.D. Tex. 2003) (collecting authorities for the proposition that restatements and GAAP violations, together with other factors such as frequency, timing, and context of restatement, add to an inference of scienter); *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CIV-256, 2001 WL 872019, at *10-11 (E.D. Tex. Mar. 30, 2001) (finding strong inference of scienter on restatement and GAAP violation and citing *In re MicroStrategy Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) for the proposition that strong inference of scienter supported where, as here, GAAP violations and restatements cover several fiscal quarters); *In re Texlon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1030 (N.D. Ohio 2000) (three years' of financial misstatements and GAAP violations yielded strong inference of scienter).

[77]     *See Pirraglia v. Novell, Inc.*, 339 F. 3d 1182, 1192 (10th Cir. 2003) (allegation that defendants violated company's policy for revenue recognition helped support strong inference of scienter); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (same); *Chelverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234-35 (D. Mass. 1999) (same).

[78]     *Enron*, 258 F. Supp. 2d at 626 n.55 (size of restatement contributes to strong inference of scienter); *Triton Energy*, 2001 WL 872019, at *10-11 (same).

[79]     *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (plaintiff's allegations re: fraud's benefit to defendant would have survived if, as here, plaintiff alleged that the defendant "actually personally profited from the fraud").

- Deaton's related dispute and quick $30 million settlement with SourceCorp. (Exhibits H & I).[80]

Taking those allegations "*in toto*," as *Barrie* requires, yields the strong inference – indeed, the only plausible inference – that Deaton acted with scienter. In *Barrie*, the Court rejected defendants' scienter challenges where, as here, in addition to allegations about accounting irregularities, the complaint identified personal profit that flowed to the defendants as a result of their fraud.[81] The Complaint here does likewise.[82]

Aside from his attack on Plaintiffs' confidential witnesses ("CW's"), which Plaintiffs address in Part II. B, *infra.*, Deaton offers three rather strained arguments to suggest that the Complaint does not yield a strong inference that Deaton acted with scienter.

### 1.    In making out a strong inference of scienter, the Complaint relies on far more than just the size of SourceCorp's restatement.

Deaton argues that the mere size of SourceCorp's restatement alone does not yield a strong inference of scienter. (Deaton's Br. pp. 19-20). Deaton is correct. But as Plaintiffs explained above, the Complaint relies on far more than the size of SourceCorp's restatement. To that end, the Complaint points out that the accounting irregularities leading to the restatement stretched out for over a dozen fiscal quarters. Those irregularities were not a one-time event like

---

[80]    *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685-86 (6th Cir. 2005) (defendant's settling ancillary disputes that arose from facts related to securities-fraud suit helped support strong inference of scienter).

[81]    *Barrie*, 397 F.3d at 261, 264.

[82]    *Compare id.* with Complaint ¶ 7, ¶ 15(c), ¶ 111, ¶ 113. Deaton tries to distinguish this case from *Barrie* by correctly noting that, in *Barrie*, confidential witnesses provided facts showing defendants' actual knowledge of accounting errors. Granted, Plaintiffs' CW's here have not provided such facts. But Deaton cannot ignore the panoply of other facts alleged in the Complaint that must be considered in toto under *Barrie*.

the asset write-down rejected in *Goldstein v. MCI WorldCom*,[83] upon which Deaton relies. Rather, they closely resemble the several quarters' worth of accounting irregularities that yielded a strong inference of scienter in *Triton Energy, MicroStrategy, Texlon*, and many other decisions.[84]

Moreover, the restatement came in the context of Deaton's effort to be paid an additional $25 million plus stock and his speedy settlement with SourceCorp, whereby he repaid more than $25 million and gave SourceCorp security interests in large amounts of real property that he owns, including what appears to be his personal residence.[85]   It also came in the context of Deaton's leaving Image Entry close in time to SourceCorp's announcing the need to restate. Thus, Deaton's first attack fails because it does not (and it cannot) account for the totality of facts surrounding SourceCorp's restatement and, given that totality, dispel a strong inference that Deaton acted with scienter.

> **2.     SourceCorp's SEC filings, including Deaton's $30 million settlement agreement with SourceCorp inextricably tie Deaton to the accounting irregularities at Image Entry.**

Deaton suggests that Plaintiffs have merely assumed that Deaton knew about or was responsible for the accounting irregularities – that Plaintiffs have not alleged any facts tying Deaton to the accounting irregularities at Image Entry. (Deaton's Br. pp. 21-22).  If nothing else ties Deaton to the accounting irregularities, his publicly announced $30 million settlement with SourceCorp inextricably links Deaton to the accounting irregularities.  Any suggestion otherwise defies common sense.   Not only does Deaton's settlement link him to the accounting

---

[83]     340 F.3d 238 (5th Cir. 2003).

[84]     *See* n.76, supra.

[85]     *See* n.24, supra.

irregularities, but SourceCorp linked Deaton to the accounting irregularities. SourceCorp did so in a March 23, 2005 conference call with analysts, where SourceCorp said, "According to the investigation, certain former members of the operating subsidiary's management allegedly diverted the expenses to entities they controlled[.]"[86]   During that same conference call, SourceCorp leadership said that the Company had "quickly dealt with the individuals who were directly implicated[.]"[87]   And CW 6 told Plaintiffs' investigators that Deaton left Image Entry shortly after SourceCorp finally uncovered the irregularities.[88]   Given the totality of facts, Deaton cannot seriously challenge the allegation that he stands, as SourceCorp put it, "implicated" in or tied to the wrongdoing at Image Entry.

### 3.    Deaton's $25 million earn-out agreement with SourceCorp easily helps support a strong inference of scienter.

Deaton argues that the earn-out agreement does not support a strong inference of scienter. To make his point, Deaton cites authorities that state a most unremarkable proposition:  vague allegations about personal benefits as motive for fraud will not do.  But in making that argument, Deaton overlooks two important points:  (1)  allegations that identify direct personal benefits indicate motive and help support a strong inference of scienter; and (2)  the Complaint here and judicially noticeable facts leave no doubt about the tremendous benefit Deaton obtained from his fraud.

In *Barrie*, the Court found compelling that the defendant's alleged wrongdoing yielded the defendant 175% of his annual salary.[89]   Surely, the $25 million plus stock paid to Deaton under the earn-out provision of the Stock Purchase Agreement amounted to far more than 175%

---

[86]    Complaint ¶ 21 (quoting conference call transcript).

[87]    Appendix (Exhibit G) at 139 (conference call transcript).

[88]    Complaint ¶ 112.
[89]    *Barrie*, 397 F.3d at 261.

of Deaton's annual salary as Image Entry's CEO (SourceCorp's own CEO made far less than $1 million a year during the class period;[90] it's unlikely that Deaton made multiples more than the CEO of the parent SourceCorp). By way of comparison, the $25 million amounted to 76.19% ($25,000,000 ÷ $32,812,500) of the cash SourceCorp paid for Image Entry. It is more than 100% of the total market value of the property Deaton posted as security for his settlement with SourceCorp (Deaton warranted that the property has a market value of $15,057,000).[91] So, by any measure, Deaton obtained a tremendous personal benefit from his fraud. Deaton's suggestion that, on these facts, the $25 million earn-out "is just a minor variation on [the] theme" that Plaintiffs' specific allegations about Deaton's enhanced compensation do not suffice to show motive or scienter rings hollow.

**B.    Allegations Based Upon Plaintiffs' Confidential Witnesses Meet Fifth Circuit Standards.**

Deaton attacks allegations based upon Plaintiffs' CW's as inadequate and unreliable. (Deaton's Br. pp. 23-29). In so doing, Deaton cites the correct Fifth Circuit standard which prefers "documentary evidence" to accompany and confirm what CW's say.[92] Documentary evidence has emerged in the form of attachments to SourceCorp's SEC filings, documents of which the Court can take judicial notice; these documents leave no doubt that about the credibility of the CW's statements concerning Deaton. To see that documentary evidence and confirmation of the CW's statements, the Court need look no further than Exhibit G (transcript of March 2005 conference call, an exhibit to SEC Form 8-K filed by SourceCorp), Exhibit H (SourceCorp press release announcing settlement with Deaton, another exhibit to a SourceCorp

---

[90]    *See* SourceCorp's SEC Form DEF 14A p. 224 (filed Apr. 22, 2005) (listing SourceCorp CEO Edward Bowman's salary at $635,000 for the year 2004.) (attached hereto as Appendix, Exhibit M, pp. 221-229).

[91]    *See* Appendix (Exhibit H) p. 176 ($15,057,000 listed as total value of real estate Deaton pledged as security for settlement payment to SourceCorp).

[92]    *See Barrie*, 397 F.3d at 259.

SEC Form 8-K), and Exhibit I (Deaton's settlement agreement with SourceCorp, an exhibit to SourceCorp's recent SEC Form 10-K).

Together, these documents leave no doubt that Deaton is the culprit, as CW's 1 and 6 said. (Complaint ¶ 108). Nor do these documents leave any doubt that, shortly after SourceCorp discovered Deaton's misdeeds, that SourceCorp fired Deaton. To that end, Exhibit G – the conference call transcript, which is quoted in the Complaint (Complaint ¶ 22), says that SourceCorp dealt with the individuals directly implicated. Exhibit H, SourceCorp's press release announcing the settlement, makes clear that SourceCorp settled with those implicated in the restatement. Now, Exhibit I, the settlement agreement itself, which Deaton signed, leaves absolutely no doubt that one of the individuals directly implicated in the fraud at Image Entry was none other than Bill Deaton. (Plaintiffs note that, in all likelihood, while Deaton's brief was being drafted, his settlement was being negotiated, which raises questions about the positions Deaton has taken regarding scienter and what Plaintiffs' CW's said.)

Given this "documentary evidence," Deaton can hardly complain about Plaintiffs' CW's. The evidence confirms in spades what Plaintiffs' CW's have said about Deaton, his misdeeds, and Deaton's scienter.

## CONCLUSION

For the reasons explained in this opposition brief, the Court should deny Deaton's motion in its totality and allow discovery to commence forthwith. In the event this Court does dismiss any part of the Complaint, Plaintiffs respectfully request leave to amend.

<u>s/ Roger F. Claxton</u>
CLAXTON & HILL
Roger Claxton (04329000)
Robert J. Hill (09652100)
3131 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone:  (214) 969-9029
Fax: (214) 953-0583

**COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.**
Herbert E. Milstein
Scott L. Adkins
Jason M. Leviton
1100 New York Avenue, N.W. ,Suite 500
Washington, D.C. 20005
Telephone:  (202) 408-4600
Fax: (202) 408-4699

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2005, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

Patricia J. Villareal (pjvillareal@jonesday.com)
Thomas R. Jackson (trjackson@jonesday.com)
Greg L. Weselka (gweselka@jonesday.com)
Michael L. Davitt (mldavitt@jonesday.com)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201

Nicholas Even (nick.even@haynesboone.com)
HAYNES & BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202-3789

Charles E. Davidow (charles.davidow@wilmerhale.com)
John A. Valentine (john.valentine@wilmerhale.com)
WILMER CUTLER PICKERING HALE
AND DOOR LLP
899 Pennsylvania Ave., NW
Washington, D.C. 20006

Joe Kendall (jkendall@provostumphrey.com)
Willie C. Briscoe
Provost Umphrey Law Firm, LLP
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204

I further certify that a true and correct copy of the foregoing document was sent by first class mail to counsel listed below that have not consented in writing to accept this notice by electronic means:

Frank E. Goodrich
Randall K. Pulliam
Baron & Budd, PC
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Lerach Coughlin Stoia Geller Rudman &
Robbins, LLP
200 Broadhollow Road, Suite 406
Melville, New York 11747

Marc A. Topaz
Richard A. Maniskas
Tamara Skvirky
Schiffrin & Barroway
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004

Steve G. Shulman
Milberg Weiss Bershad Hynes & Lerach,
LLP
One Pennsylvania Plaza
New York, New York 10119

Maya Saxena
Joseph E. White, III
Milberg Weiss Bershad Hynes & Lerach,
LLP
5355 Town Center Road, Suite 900
Boca Raton, Florida 33486

Richard B. Brualdi
The Brualdi Law Firm
29 Broadway, Suite 2400
New York, New York 10006

Steven J. Toll
Daniel S. Sommers
Jason Leviton
Scott L. Adkins
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
1100 New York Avenue, N.W.
West Tower Suite 500
Washington, D.C. 20005

s/ Roger F. Claxton
Roger F. Claxton